May it please the court, my name is Mark Caldwell. I'm representing Carol Graham this morning in the Social Security Disability Appeal. And by the way, the case Larry couldn't remember is Bray, B-R-A-Y, on the post hoc rationale. I will keep track of my own time, but I would like the court to understand that I'm going to try to reserve two minutes for rebuttal. This is a very straightforward case in the sense that it's a single issue case, which is unusual in the cases that I bring before this court. It's the treating physician, Dr. Nelson, who said that this lady suffering from mental impairments could not sustain work activity. I'm going to get to what I think is the most interesting issue first, and that's the reliance upon global assessment of functioning scores. As the court is aware from my brief, there's a scale of 1 to 100. One means you're a mess, and 100 means you're doing great, and somewhere in between. And the administrative law judge relied upon various global assessment of functioning scores to discount the treating doctor's assessment. Of course, he didn't realize he was the treating doctor. He said Dr. Nelson wasn't treating. I counted 12 treatment notes in this record from Dr. Nelson. But the district said he doubted it. I don't understand why he's accorded the identity of a treating physician when there's no evidence in this record that he treated the claimant. That's pretty much a paraphrase of the ELJ's language. I can't think of a more fundamental error when you're assessing the weight to be accorded to a treating physician's opinion when you don't even recognize the doctor is a treating physician. But the point that I would like to emphasize in this case, and I think it merits some clarification by this court, is an assessment of functioning in a treatment setting does not translate to an individual's ability to sustain work-related activities on a regular and continuing basis. And I'm not making this argument. The commissioner makes this argument in Social Security Ruling 85-15, which is in my brief. The commissioner says people with mental impairments frequently have their lives structured in such a way that they appear to function well. Well, that's what we see when we're looking at these GAF scores in a treatment setting. They are not predictors of the ability to sustain work. Now the district court erroneously relied upon two cases that this court has talked about GAF scores, Bayless and Morgan, and said, well, in those cases the GAF scores were even worse and this court said that those people could work. This court did not say that in either one of those cases. In both of those cases, this court merely said that the ELJ was allowed to reject the assessment of the doctor, not that the assessment of the doctor meant that the person could work. And then the commissioner doesn't even make that argument in their response brief. The commissioner cites a different case, Rollins, where there was a GAF of 70. And that also is not a case where this court said a GAF score meant that a person could work. In Rollins, the person was being discharged from an addiction center, and among other things there was this GAF score that meant that there would be a functional ability to sustain work in the workplace. And so that's an area that I think needs to be addressed by this court. Are there any cases that say that the GAF rating in and of itself would be a clear and convincing reason for ignoring the treating physician's diagnosis and treatment? I haven't found a single thing anywhere, any circuit. So this is what I think is important. Then let's talk about the treating physician. Dr. Nelson said that this woman's mental impairments would make it difficult for her to be steady in any occupation. Take that language and put it right next to the language in Social Security Ruling 96-8P, where that's footnote 11 of my brief, by the way, where the commissioner says it is the agency's duty to assess a person's residual functional capacity based on the ability to sustain work-related activities on a regular and continuing basis. You can't put those two things next to each other and not conclude that the treating psychiatrist's assessment shows that this lady could not sustain work-related activities on a regular and continuing basis. That being the case, the question then becomes what should be done. What should be done in this case, I respectfully submit, is this matter should be remanded for determination of benefits based upon the treating psychiatrist's assessment. Yes, Judge Rittle. Judge Rittle Before we get to remedy, I gather your point is that given the diagnosis of insecurity and depression, that the evidence of her working around the apartment complex, the five hours' work she does, really isn't or should not have been considered by the ALJ as that relevant and probative on the issue of whether she could sustain a permanent job. Is that the thrust of your remark? Yes. I would go respectfully further. I would say it's ludicrous to look at a person who in their own apartment complex can perform some activities five hours out of a week and translate that into some sort of ability to sustain work-related activities. The point I wanted to make is that the diagnosis becomes important here. In other words, with some diagnoses, it may be that five hours of work would be relevant and probative of what one could do, an orthopedic handicap, for instance. Okay. Sure. Okay. But your point is, given the psychiatric diagnosis, it's not relevant and probative of sustainability. Precisely. Precisely. So with that said, I also want to address a comment that the Commissioner frequently makes in their response brief, that there's a split of authority in the Ninth Circuit on accrediting as true rule. That's incorrect. I know the Vasquez Court said there's a split in authority, but it's just not true. The so-called split, I'll use two cases in an example, is Connett, C-O-N-N-E-T-T, where this Court said we're not sure whether that's mandatory or discretionary. But look at the facts of Connett. The facts of Connett are where the district court said there were many discrepancies between the claimant's testimony and the reported limitations. And this Court correctly noted, under the Bray case that I just mentioned, that we can't rely upon what the district court says. We have to review the ALJ decision, so we're sending it back. I represent claimants, and I'm telling you it should have been sent back. People who have a great deal of discrepancy between their testimony and the reported limitations shouldn't be given an award of benefits. Contrast that with Lester, which is very similar to the present case. In Lester, the treating physician's opinion was given credence, and this Court noted, well, when that opinion is given credence, there are no other issues that need to be decided. We're done. That's what this Court should do. I'm coming up on my time. Judge Rilder, do you have a question? Rilder, I had one issue, if I may, and that is, what do you make of these remarks and the clinical notes of the treating physician? I mean, Unruh uses the word unremarkable and words like that to define the progress of your client. If you're not sure, there are lots of statements where it says okay, it says stable. You know, we're dealing with a person with a schizoaffective disorder. Unremarkable means she's not seeing people climbing up the walls. Unremarkable doesn't mean you're fine, go forth and work. He's not saying you're cured, but he's saying the situation is what it's been, stable. Stable. Stable means not getting worse. Stable doesn't mean better. I see. Thank you. Thank you, sir. Good afternoon, Your Honors. My name is Shay Bond on behalf of the Commissioner of Social Security. I respectfully disagree with my colleague's opinion that GAAP scores in this case were irrelevant to assessing Dr. Nelson's opinion that the claimant can't work. Clinicians and treating physicians who had evaluated the claimant, and this is after hearing her subjective complaints of mental symptoms and after their clinical observation of the claimant, nevertheless assessed her with GAAP scores ranging from approximately 60 to 75. These GAAP scores were issued over a period of approximately five and a half years. These GAAP scores showed that at most, or at worst, the claimant had moderate mental symptoms and at best that she was actually functioning pretty well and only had slight mental symptoms. What do you do with the argument that these GAAP scores really are not terribly probative of how she would react in the 40-hour-a-week work environment? Well, when we look to the definition or the purpose of a GAAP score, it is used to determine treatment for the claimant, but it also assesses a claimant's occupational, scholastic, and social functioning. Now, obviously a doctor, when they assess a GAAP score of, say, 75 in this case, isn't assessing her ability to work during the 15, 20, or 30-minute session that the doctor is observing this claimant. Obviously they're rendering an opinion regarding the claimant's functional ability also outside of the clinical setting. I would also submit that the ALJ accurately pointed out that if the clinicians and treating doctors truly believed that the claimant was limited, that they would have assessed GAAP scores in a much lower range, suggesting serious or more problematic symptoms. They did not. I know that counsel in his brief suggested also that GAAP scores are just these snapshots of what's going on in the clinical presentation. However, on a couple of occasions, I believe it was Dr. Perry and a clinician at the La Frontera Behavioral Clinic, they specifically assessed the GAAP score for the past year. And they, I believe it was the La Frontera, yes, the La Frontera Clinical Group had assessed the claimant with a GAAP score of 70 for the past year. That's one of the higher GAAP scores that this claimant received, again, suggesting that she only had slight symptoms. Dr. Perry also had assessed the claimant with a GAAP score of 65. That was between the period of approximately February of 2001 through February of 2002. Again, a 65 is showing, I believe, that's only mild psychological symptoms. So, again, I think just arguing that these GAAP scores are only assessed in this very narrow clinical setting is just a very narrow view, and it should be rejected in this instance. I was concerned in this case by the partial reliance on her ability to do this work around the apartment complex. I was concerned about the sustainability issue, whether that showed any ability to sustain her 40-hour work week. I'd like your view on that as I got your question a few moments ago. Sure, thank you. I think you look at the form that Dr. Nelson had completed, and he's describing the, I guess, the symptoms that he's determined that render her unable to work. That's page 136 of the transcript and 144 of the excerpts of record. He's regarding, he talks about ongoing insecurity, fears, depression, and it looks like it says nightmares. When you actually look at the work activity for the apartment complex manager, let me step back for a second. When the claimant testified, she said that her disabling symptoms resulted from post-traumatic stress disorder and that she couldn't be around strangers. She found it difficult to concentrate because of her mental symptoms. However, when you look at the duties of the work that she performed as an apartment manager, she was showing empty apartments to strange people who were looking to rent the units. That is inconsistent with her allegations, and I would also say inconsistent with the statement from Dr. Nelson stating that ongoing insecurity is one of her reasons that she can't work. If she was insecure, how was she able to show around strangers to these apartments? How was she able to go into her neighbor's apartments to perform the plumbing activities that she was doing for the landlord? She also had stated in her testimony that she completed reports for her landlord. I think there was also testimony stating that she and a fellow neighbor were soliciting bids from other contractors to do more important and more rigorous construction activities and a job and then was presenting that to the landlord. That would show that she at least sustained concentration at a level that's inconsistent with her allegations of disability, and I would say it would contradict some of these symptoms that Dr. Nelson listed as a basis for her being unable to work. I would also point out that when you look at Dr. Nelson's treatment records, and this is one of the last questions that you had asked opposing counsel, what's the importance of describing the mental status exam as okay or unremarkable? I would disagree that the statement that the examinations were unremarkable are synonymous with that she's stable with her symptoms. I think stating that someone is unremarkable says that there are no outstanding symptoms that they could observe on mental status examination. If, as claimant claims today, she's having these kind of semi-psychotic episodes, why was that not put down in the mental status examination? There's no discussion of that. And actually, when you look at Dr. Nelson's treatment records, there's really very little discussion of the claimant's subjective complaints even. I think about half of the ten treatment records, the claimant's actually discussing her, I guess, displeasure with how her disability application is proceeding. And she's asking Dr. Nelson to provide evidence that she can, medical records that she can provide for her disability hearing. I mean, there's very little discussion of these symptoms that she's alleging that are disabling her extraneous to, I guess, the disability process. So I think there's just an absolutely lack of objective findings supporting Dr. Nelson's claim. You have all of these GAF scores, again, over a period of about five and a half years, showing that the claimant was functioning pretty well for the most part. And then lastly, you do have this job, which, albeit it was part-time, but did suggest that she retained mental abilities that exceeded her statement of disability and also showed that she was working, albeit part-time. And if the court has any further questions, I'd be happy to address those now. Otherwise, I would ask that this court affirm the district court in this decision. Thank you. Three points. One, it's interesting to rely upon a claimant's reports of activities to find them not credible when you are assuming the person is telling the truth when they report those activities. She could have hid her work history. She didn't. Two, please refer to page 7 of my reply brief. My reply brief, I hit the books and did some medical research. I go to the comprehensive textbook of psychiatry, and I talk about GAF scores, which are ratings made for the past week, although the highest during the past year can be used. That contrasts with the ability to sustain work-related activities. Third, Dr. Nelson's assessment, opposing counsel stopped reading too quickly. It says major depression recurrent, childhood sex abuse with PTSD, ongoing security, fears, depression, nightmares, dash, poor work stability, dash, can't work. Anxiety and depression symptoms make it hard for her to be steady in any occupation. That should be the basis for remand for determination of benefits. That's at ER 86. 144. 144 of the excerpts of record, Your Honor. The center. Numbers all over this page. I know. I've got the right page. Are there any questions I can answer? No. Thank you. Thank you. Thank you both. Appreciate the argument. Off the record, I don't know how you people do it. We have very low GAF scores. We will stand in recess for the day. And Judge Reimer will reconvene briefly in the conference room.
judges: Ripple, Rymer, Fisher